**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL NO. 3:10cv00747** |
| | ) | |
| **EBONY WOOD IN VARIOUS FORMS** | ) | **JUDGE HAYNES** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE CLAIMS FOR LACK OF STANDING AFTER A HEARING

Pursuant to Rule G(8)(c)(i)(B) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the United States has moved, after a hearing, to strike the claims of Gibson Guitar Corp., Inc. ("Gibson") and of Theodor Nagel GMBH & Co KG ("Nagel") (collectively referred to as "Claimants") from this civil forfeiture action because Claimants lack prudential standing because the seized Madagascar ebony wood ("Defendant Property") is contraband or other property illegal to possess. *See* 16 U.S.C. § 3374; 18 U.S.C. § 545; 18 U.S.C. §§ 983(d)(4), 983(a)(1)(F).

## I.    INTRODUCTION

Gibson employee and wood specialist Gene Nix wrote

[t]he true Ebony species preferred by Gibson Musical Instruments is found only in Madagascar (Diospyros perrieri). This is a slow-growing tree species with very little conservation protection and supplies are considered to be highly threatened in its native environment due to over exploitation. "(Exhibit 1-1: Seiler Affidavit, September 20, 2007 Trip Justification by Nix, 1)[1].

---

[1]The Seiler Affidavit found at Exhibit 1 provides the authentication and explanation of the attachments to Exhibit 1

I spent two and a half weeks in Madagascar this June [2008],I represented our company along with two other guitar manufacturers.... *All legal timber and wood exports are prohibited* because of wide spread corruption and theft of valuable woods like rosewood *and ebony*." (Exhibit 1-2 : Seiler Affidavit, August 26, 2008 e-mail from Nix re Madagascar trip) (emphasis added).

Nix was correct, Madagascar ebony is extremely rare, and has been banned from exportation and commercialization since 2000 with extremely limited exceptions. *See Malagasy April 30, 2000 Order* 11832/2000 (hereinafter Order 11832/2000)(banning exportation of ebony in unfinished form); *see also 2006 Malagasy Inter-Ministerial Order 16.030/2006* (hereinafter Order 16.030/2006) (prohibiting the harvest of ebony and rosewood and the export of existing stocks of ebony, except in finished products).(Exhibit 1-3: Seiler Affidavit, Order 11832/2000 and Order 16.030/2006, 1 - 5, 6 - 9)[2]; Exhibit 2: August 2009 Global Witness report, v)[3].

In 2008, Gibson was investigating potential solutions for legitimate harvest, but the solutions were *long term,* and Gibson was in a hurry. Nix wrote:

> Maderas Barber "has been in the business a long time and may be able to help begin some legitimate harvests. Mr. [Roger] Thunam on the other hand should." now be able to supply Nagel with all the rosewood and ebony for the *grey market*." (Exhibit 1-4: Seiler Affidavit, February 25, 2009 email from Gene Nix)(emphasis added).

Nix knew that the grey market meant purchasing contraband in the form of unfinished blanks from Thunam, and Gibson did just that, even though Nix advised:

> Key things we saw [at Thunam's Madagascar business]- large yard, wood in yard not properly stored; *it is under temporary seizure and cannot be moved: substantial*

---

[2]Copies of Malagasy Law contained in Exhibit 1-3 have certified English translations.

[3] In "July 2009, the Director General of the Madagascar National Parks (MNP) asked Global Witness and the Environmental Investigation Agency, Inc. (EIA) to put together an expert mission to analyze and investigate the trafficking of precious wood in the SAVA Region" which is referred to herein as the August 2009 Global Witness report. (Exhibit 2: August 2009 Global Witness report, Mission Background, 2)

*stored quantities of cut items for export including blanks for various instruments. Mostly ebony. . .* (Exhibit 1-5: Seiler Affidavit, Review of trip, 3) (emphasis added).

Based on a 1990 United States Customs Service("USCS") Ruling to Gibson, Gibson knew that the Blanks were declared correctly to Customs as duty-free unsawn [unfinished] wood, not the finished fingerboards they now argue the wood to be, because the unsawn wood was not guitar parts requiring little or no cutting after receipt by Gibson. Cust.B&Dec. HQ 733299 ("Ruling HQ 73329").(Exhibit 6: Ruling HQ73329). Thus, in regard to the seized property, the tendered "authorizations" (D.E. 5: Authorizations, 5-13) for finished products are inaccurate.

The Defendant Property is contraband under Madagascar law, contraband under the Lacey Act and contraband under 18 U.S.C. §§ 545. Therefore, the United States respectfully moves this court to strike Gibson's and Nagel's claims for lack of prudential standing.

## II.    BACKGROUND OF THIS LAWSUIT

### A.    Procedural History.

On September 23, 2010, Gibson filed a claim to the Defendant Property.[4] (D.E. 4: Verified Claim, ¶ 1). Gibson initially refused to provide proof of its supposed ownership to the undersigned. (D.E. 4: Verified Claim, ¶ 4,5). Subsequently, Gibson answered Special Interrogatories and provided invoices that reflect Nagel invoice Gibson on September 9, 2009 for the seized ebony, the ebony would have shipped with an estimated time of arrival in Hamburg on September 17, 2009 and in New York on September 28, 2009, and to Charleston, South Carolina per vessel "Liverpool Express."(Exhibit 3: Interrogatory Supp. Resp., 8 -10, 000001 - 8). Gibson's documents reflect that

---

[4]Gibson has not filed an Answer because it filed a Rule 12 Motion to Dismiss. Fed.R.Civ.P.Supp.R. G(5)(b). On November 18, 2010, the United States filed a Preliminary Response to the Motion to Dismiss and will be filing a further response along with this Motion. Special Interrogatories were served on Gibson, temporarily staying the United States' deadline to respond to Gibson's Motion to Dismiss. Fed.R.Civ.P.Supp.R.G(6).

Hunter Trading Corporation delivered the Madagascar ebony wood to Gibson. Id. The sole source of Nagel's ebony is from Madagascar through Roger Thunam. (D.E. 3: Affidavit of Agent Seiler, ¶¶ 14 - 17)[5].

On September 30, 2010, Nagel filed a claim asserting the Defendant Property was Nagel's because Gibson had not paid Nagel. (D.E.5: Verified Claim, ¶ 2). On October 22, 2010, Nagel filed a second Verified Claim stating "Nagel is only the owner of the fingerboards stored and seized at the Red Arrow Delivery warehouse." (D.E.9: Verified Claim, 3).

B.     **The Relevant Facts.**

1. **Demand for banned Madagascar ebony wood is high.**

Ebony is the name for a suite of tropical tree species in the *Diospyros* genus. (Exhibit 1-6: Seiler Affidavit, Concept Note, 10). Ebony is a slow growing, dense hardwood with a fine wood grain. (Exhibit 1-7: Seiler Affidavit, 2007-2012 Gibson SmartSource Action Plan, 7). Supplies of ebony are limited, due in part to its slow growth and consequent lack of plantations of ebony, while demand is high due to its particular qualities. *Id.* Because ebony has not grown as quickly as it has been harvested, ebony has become increasingly rare. ( Exhibit 1-1: Seiler Affidavit, September 20, 2007 Trip Justification by Nix,1). Some of the most highly prized ebony is found in the rainforests of Madagascar. (Exhibit 2: 9/2009 Global Witness report, 4; Exhibit 1-6: Seiler Affidavit, Concept Note, 1, 10; Exhibit 1-7: Seiler Affidavit, Gibson SmartSource Action Plan, 3, 7). One of the reasons that Madagascar ebony wood is banned from exportation and commercialization is because Madagascar is a poor country with serious deforestation concerns; ("Madagascar is one of the

---

[5]The declaration requirement of the Lacey Act were enforceable as early as "April 1, 2009, the other Lacey Act amendments are already effective and actions to enforce provisions of the Act other than the declaration requirement may be taken at any time." *See* 74 Fed. Req. 5911, 5912 (Feb. 3, 2009) D.E. 8-3: Federal Register, Vol 74, No.21, 2.

poorest and least developed countries in the world." "Illegal logging is a major illicit activity that is destroying the forests. . ." (Exhibit 4: 2009 Country Brief, 1, 9)[6].

## 2. *Gibson's desire to obtain Madagascar ebony wood leads them to research alternative long range sustainable forests while satisfying their present ebony needs with the "grey market"*

As early as 2007, Gibson was aware that "*[t]here are no certified sources of ebony at present*...." (Exhibit 1-1: Seiler Affidavit, September 20, 2007 Trip Justification by Nix) (emphasis added); (Exhibit 1-7: Seiler Affidavit, 2007 - 2012 Gibson SmartSource Action Plan, 6-7). Significantly, if there are no certified sources of ebony, then Gibson's argument that finished wood is legal to import is irrelevant because the import of uncertified ebony wood from Madagascar in finished or unfinished form is illegal. *See 2006 Malagasy Inter-Ministerial Order 16.030/2006* (Exhibit 1-3: Seiler Affidavit, Order 16.030/2006, 6-9).

Even so, Gibson still desired to obtain Madagascar ebony wood. Nix had recognized that "[t]he true Ebony species preferred by Gibson Musical Instruments is found only in Madagascar (Diospryos perrieri)" and further knew that it was a slow-growing tree species with very little conservation protection and highly threatened supplies due to over exploitation. (Exhibit 1-1: Seiler Affidavit, September 20, 2007 Trip Justification by Nix, 1). Nix noted:

> "One of the challenges facing Gibson Musical Instruments in the company's quest for increasing FSC[7] certified wood input is the use of Ebony and Indian Rosewood

---

[6]The Country Brief of Madagascar is published by eStandards Forum Financial Standards Foundation http://www.eStandardsForum.org/ (last viewed on May 26, 2011)(eStandards Forum "promotes a sound, transparent, and equitable global economy. It collects and disseminates, as a public good, information on countries' compliance with global best practice standards.")

[7]FSC or Forest Stewardship Council is "an independent, non-governmental, not-for-profit organization established to promote the responsible management of the world's forests" which provides "accreditation services to a global network of committed [entities],"and its "certification provides a credible link between responsible production and consumption of forest products." www.fsc.org/about-fsc.html. (last viewed on June 3, 2011).

in production. . . . Ebony and Rosewood are sourced from countries and regions that have poorly established forest management guidelines, institutional oversight or illegal logging controls." (Exhibit 1-1: Seiler Affidavit, September 20, 2007 Trip Justification Nix, 1)(Exhibit 1-7: Seiler Affidavit, 2007 - 2012 Gibson SmartSource Action Plan, 7).

So, Gibson researched the potential for a legal sustainable management and conservation measure which could be introduced as a supply chain with progression toward FSC Certification which would need to be implemented over a ***long-term*** time frame. (Exhibit 1-7: Seiler Affidavit, 2007-2012 Gibson SmartSource Action Plan, 7).

In April 2008, the World Trade Organization ("WTO")[8] noted that in Madagascar, "[t]he exportation of rough and semi-finished wood has been prohibited since July 2007."[9]  (Exhibit 5: 2008 WTO Press Release, Excerpt, 2). In an August 2008 e-mail, Nix recognized the ban on the harvest and exportation of precious wood supplies by the Malagasy government.

> I spent two and a half weeks in Madagascar this June.  I represented our company along with two other guitar manufacturers . . . ***All legal timber and wood exports are prohibited because of wide spread corruption and theft of valuable woods like rosewood and ebony***. In a managed forest scenario a chain of custody can be maintained from forest to finial product.  We were there to let them know that a tree that they felt was in the way might be able to help sustain their community and 'us' into the foreseeable future.  The average annual income in Madagascar is about $275 or 75 cents a day.  Some of the timber that we looked at had been cut down and pushed aside to plant rice. It was worth tens of thousands of dollars." (Exhibit 1-2 :

---

[8]The WTO is "the only global international organization dealing with the rules of trade between nations.  At its heart are the WTO agreements, negotiated and signed by the bulk of the world's trading nations and ratified in their parliaments. The goal is to help producers of goods and services, exporters, and importers conduct their business." http://www.wto.org/english/thewto_e/whatis_whatis_e.htm (Last viewed March 10, 2011)

[9]The WTO press release was apparently referring to Inter Ministerial Order  10885/2007 ("Order 10885/2007") which banned the exportation of wood extracted from all categories of natural forest in raw or semi-finished form. (Exhibit 1-1: Seiler Affidavit, Order 10885/2007, 10-13).  Order 16.030/2006 banned extraction and exportation of rosewood and ebony, except as finished products while Order 10885/2007 expanded the ban to all wood from natural forests. (Exhibit 1-1:  Seiler Affidavit, Order 16.030/2006, 6-9).

Seiler Affidavit, August 26, 2008 e-mail from Nix re Trip to Madagascar) (emphasis added).

In a written review of the Madagscar trip, Nix noted that on June 15 (Sunday), he traveled by private plane to Antalaha and visited with private companies in logging and processing, notably Mr. Thunam's business and referenced photo A#20. (Exhibit 1-5: Seiler Affidavit, Review of trip program, 3 ). Nix further noted:

> Key things we saw- large yard, wood in yard not properly stored; *it is under temporary seizure and cannot be moved: substantial stored quantities of cut items for export including blanks for various instruments. Mostly ebony. . .* (Exhibit 1-5: Seiler Affidavit, Review of trip program, 3) (emphasis added)

.

Referenced photo A#20 is a copy of blanks which are similar in nature to the blanks that were transported from Red Arrow Delivery Service to the Gibson manufacturing facility.(Exhibit 1-5: Seiler Affidavit, Review of trip program, 3; Exhibit 1-8: Seiler Affidavit, Photo Red Arrow blanks). Thunam's Madagascar "factory" was nothing more than a few people with a table saw and clearly incapable of making a finished product such as a fingerboard. (Exhibit 1: Seiler Affidavit).

In a February 25, 2009, e-mail from JariAla Project[10] Director Andrew Keck ("Keck") to Nix and others, Keck provided Nix with a file that showed that Thierry Body was the only person the Malagasy government had given the right to export ebony under special exception. (Exhibit 1-4: Seiler Affidavit, February 25, 2009 Keck e-mail to Nix, and file, 5, 9). Nix had previously observed that Thunam's stock of ebony wood had been seized in place; "... there was a considerable stockpile of wood, including with Mr. Thunam, that had been provisionally seized pending

---

[10]The JariAla project is a USAID-funded project which supports reforms in Madagascar to improve sustainable forest management. (Exhibit 1-9: Seiler Affidavit, June 23, 2008 e-mail from Gene Nix to Clay Maxie.).

investigations to determine its legality..."[11] (Exhibit 1-4: Seiler Affidavit, February 25, 2009 Keck e-mail to Nix ,and file, 1). Thunam had no legal stock acknowledged by the Madagascar government under official inventory as required under Order 16.030/2006. (Exhibit 1-4: Seiler Affidavit, February 25, 2009 Keck e-mail to Nix and file, 5, 9).

On February 25, 2009, in a reference to the potential *long term* solution, Nix wrote to Gibson Employee Dave Berryman and said that "Barber[12] has been in the business a long time and may be able to help begin some legitimate harvests. ***Mr. Thunam on the other hand should now be able to supply Nagel with all the rosewood and ebony for the grey market.***") (Exhibit 1-4: Seiler Affidavit, February 25, 2009 email from Gene Nix,1)(emphasis added).

A September 17, 2009, Madagascar Communique (an official government statement) reinforced that no timber concessions had been granted and that all cutting and extraction of ebony were illegal. (Exhibit 1-3: Seiler Affidavit, Communique, 20-21).

> ### 3. Upon import to the United States and in accordance with previous Customs Rulings, the Madagascar ebony sawn wood was declared under a tariff code for duty-free rough sawn wood instead of the HTC 5.7% duty for musical instruments parts.

The 1990 tariff classification ruling requested by and issued to Gibson in 1990 made it clear that if the ebony were a finished product such as a guitar part that requires little or no cutting to make

---

[11]In 2008 Thunam was the subject of one of six cases which were brought by the judiciary in Antahala against traders suspected of trading illegally in precious woods; Thunam was one of two cases which resulted in a guilty verdict.(Exhibit 2: August 2009 Global Witness report, 22, 39) "One trader Mr. Thu Nam was released from custody in late 2008 after payment of an out-of-court settlement." (Exhibit 2: August 2009 Global Witness report, 22, 39).

[12]In February 2009, talks about the long-term solution included a request from Keck to Nix and others to become involved in a initiative to organize and implement a test harvest. Nix had entered into discussions with the company Maderas Barber as a partner in the endeavor. (Exhibit 1-4: Seiler Affidavit, February 25, 2009 Keck e-mail to Nix and file, 2).

the parts fit together cleanly, *i.e.*, or fitted with frets, and holes to receive tuning gears, it would receive a tariff code related to the Harmonized Tariff Code of the United States ("HTC") series 9202. Cust.B&Dec. HQ 733299. (Exhibit 6: Ruling HQ 733299)

In 2005, the importer of the seized ebony, Hunter Trading Corporation, also requested a tariff classification ruling. The Ruling letter issued to Hunter Trading Company stated that sawn ebony thicker than 6 mm qualifies for a HTC in the 4407 series. This is similar to the ebony ordered by Gibson,[13] The Ruling specified that "ebony wood (Diospyros spp.) in sawn sizes of 521 x 70 x 9mm ... sourced in the sawn sizes stated in Madagascar ... will be 4407.99.0091. ... The rate of duty will be free." Cust.B&Dec. NY L83277)("Ruling NY L83277").(Exhibit 7: Ruling NY L83277).

Consequently, upon import, the Defendant Property was declared to United States Customs under the HTC 4407 series specifically described for rough sawn wood and not HTC 9202 for finished wood products. (Exhibit 1-10: Seiler Affidavit, Customs Declaration documents, 2,3; Exhibit 1-11: Tariff Code excerpt, 1-4. For purposes of Tariff Code 4407, "the term 'rough' includes wood that has been edged, resawn, crosscut or trimmed to smaller sizes but it does not include wood that has been dressed or surfaced by planing on one or more edges or faces or has been edge-glued or end-glued." (Exhibit 1-11: Tariff Code excerpt, 3, Statistical Note 1.). The Article Description applicable to Tariff Code 4407 includes "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm(con)." Thus, the Defendant Property was declared in a manner consistent with the prior Rulings and Claimants' understanding before this lawsuit.

---

[13]See Invoices produced by Gibson reflecting the Madagascar ebony they purchased was 9 mm thick. (Exhibit 3: Interrogatory Supp. Resp., 8, 00001, 00006).

Gibson Invoice number 52147( and related Delivery Orders 90147 and 10859 ) refers to "MADAGASCAR BLACK EBONY, SAWN SIZES, K.D. (Diospyros spp., Madagascar), 2,133 pcs 521 x 70 x 9mm." (Exhibit 3: Interrogatory Supp.Resp., 8,9, 00001, 000004 - 6, 000008 ) ( D.E. 5: Verified Claim with attached invoices, 3,4). Gibson's Invoice number 52146 (and related Delivery Order 10861) refers to "EBONY SAWN SIZES (Diospyros spp., Madagascar) 5,200 pcs. 508 x 70 x 9 mm" with only 1,500 pieces of Ebony, 521 x 70 x 9mm delivered to Gibson. While Nagel's claim alleges that the Defendant Property is "2,133 pieces Black Ebony fingerboards for guitars, **exact sizes** 521 x 70 x 9 mm and 5,200 pieces Black Ebony **fingerboards for guitars** exact sizes 508 x 70 x 9mm, respectively for invoices no. 52147 and 52146," the invoices do not contain the words "fingerboards" or "exact sizes." (D.E. 5: Verified Claim at ¶1)(emphasis added).

### 4.  *Gibson received the banned Madagscar ebony wood at its manufacturing facility.*

On November 17, 2009, law enforcement arrived at Gibson's manufacturing facility to find that Gibson had received and had possession of unfinished Madagascar ebony wood which was in the process of being transformed into finished guitar parts through a manufacturing process. (Exhibit 1: Seiler Affidavit) In response to interrogatories, Gibson produced invoices from Nagel revealing that Madagascar Ebony, in sawn sizes was ordered by Gibson from Nagel on September 9, 2009. (Exhibit 3: Supplemental Response, 8, 00001, 00006).  Gibson provided related purchase orders reflecting the ebony was purchased later than the invoices reflected, *i.e.*, October 19, 2009 and November 6, 2009. (Exhibit 3: Interrogatory Supp. Resp., 8, 00002 -3, 00007). Gibson also provided Delivery Orders reflecting that the Madagascar ebony was delivered October 16, 2009, October 22, 2009, and November 6, 2009. (Exhibit 3 : Interrogatory Supp.Resp., 8, 00004, 00005, 00008).

Gibson claims it acquired title to the Defendant Property upon delivery. (Exhibit 3: Interrogatory Supp. Resp. 10-11).

Therefore, Gibson has acknowledged that the seized property contained Madagascar ebony, however in its pleading, Gibson argues that because the ebony was "fingerboards" it was imported in "finished" form and is thus legal.[14]

In fact, the Madagascar ebony wood arrived at Gibson's plant in the form of blanks. (Exhibit 1-12: Seiler Affidavit, Photos of Manufacturing Process, 2). Blanks are "blocks of wood processed to specific dimensions, that can then be cut into fingerboards and other instrument parts." (Exhibit 1-13: Seiler Affidavit, Program for information-gathering trip to Madagascar, 2). "The guitar manufacturer will then cut the blank to fashion the individual fingerboard pieces." (Exhibit 1-13: Seiler Affidavit, Program for information-gathering trip to Madagascar, 3).

### 5. The Madagascar ebony wood was unfinished and was substantially transformed at Gibson's manufacturing facility.

Once the sawn sizes of Madagascar ebony wood blanks arrived at Gibson's manufacturing facility, the Defendant Property would undergo several manufacturing stages which are briefly described below (and which were observed by and described to Special Agent Kevin Seiler by employees at Gibson) as the blanks were being transformed into guitar "fingerboards:"

    a. Gibson retrieves the imported rough sawn pieces of ebony wood from the Red Arrow Delivery Service contracted warehouse, where it was stored. (Exhibit 1-12: Seiler Affidavit, Photo 1)

---

[14] It must be noted that Order 16.030/2006 refers to the export of finished wood (assuming the wood has appropriate regulatory paperwork and certified) such as a fret board and not to fingerboards. (Exhibit 1-3: Seiler Affidavit, Order 16.030/2006, 7,9). A fret board is a fingerboard with frets. (Http://m.wordnik.com/wods/fretboard (Last viewed 5/31/11). However, even if Order 16.030/2006 refers to a fingerboard and not a fret board, to be a finished fingerboard, a blank piece of wood must go through a substantial transformation.

Page 11 of 25

b. The rough sawn pieces are kiln dried as required, since the ebony wood is normally still wet when it is received from the Red Arrow Delivery Service warehouse. (Exhibit 1-12: Seiler Affidavit, Photo 2)

c The sawn pieces of ebony wood are further cut into a semi-domed shape and reduced in overall dimensions of width, height and length and tapered to be wider at the bottom and narrower at the top. (Exhibit 1-12 : Seiler Affidavit, Photo 3)

d. Decorative inserts, as required for the particular model of guitar the fingerboard is being manufactured for, are imbedded flush and glued onto the shaped ebony pieces of wood. (Exhibit 1-12: Seiler Affidavit, Photo 4)

e. Fret lines are precisely cut into the shaped ebony wood pieces. (Exhibit 1-12: Seiler Affidavit, Photo 5)

f. Metallic "frets" are imbedded into the cut fret lines at a specified depth into the pieces of wood.(Exhibit 1-12: Seiler Affidavit, Photo 6)

g The "frets" are set in a type of immobilizing wax-like or plastic substance to hold the frets precisely in place until they are permanently set and adhered to the ebony wood.(Exhibit 1-12: Seiler Affidavit, Photo 7)

h. The immobilizing substance is later removed and the frets are trimmed flush with the tapered ebony wood pieces.  The sharp edges of the frets are sanded smooth.(Exhibit 1-12: Seiler Affidavit, Photo 8)

I. The completed "fretboards"are then fitted to the guitar necks they were manufactured to fit and assembled on the guitar necks.(Exhibit 1-12: Seiler Affidavit, Photo 9)

j. The guitar necks are then assembled and fitted to the guitar bodies they were manufactured for.  Bridges are installed as required on the face of the guitar body. (Exhibit 1-12: Seiler Affidavit, Photo 10)

k. The guitar body and neck assemblies are buffed and polished as a single unit.(Exhibit 1-12: Seiler Affidavit, Photo 11)

m. Electronic components are installed in the guitar body as required by the specific model being manufactured.(Exhibit 1-12: Seiler Affidavit, Photo 12)

n. Strings are installed on the guitar.(Exhibit 1-12: Seiler Affidavit, Photo 13)

o. The guitars undergo quality control inspections and related evaluations.

(Exhibit 1-12: Seiler Affidavit). The resulting fingerboards and/or fretboards are substantially transformed in the manufacturing process. (Exhibit 1-14: Seiler Affidavit, Photos beginning blank to finished product).

Claimants argue the Defendant Property is legal finished products. Nagel produced three (3) alleged authorizations for Thunam all with a departure date of March 27, 2009 to export finished products to Theodore Nagel.(D.E. 5: Claim). First, there is no indication that these alleged authorizations relate to the Madagascar ebony delivered to Gibson. Second, the authorizations are for "finished products" and the Defendant Property is clearly unfinished based on the tariff code under which it was imported and a visual inspection of the Defendant Property. Finally, Thunam's Madagascar stock of ebony wood had been inventoried and declared illegal by the Madagascar government. (Exhibit 1-15 : Seiler Affidavit, Inventory Report).

## III.    ARGUMENT

### A.    Neither Gibson Nor Nagel Has Prudential Standing.

Standing is a threshold issue in every civil forfeiture case because it determines the jurisdiction of the court to consider the claimant's claim. *See Warth v. Seldin,* 422 U.S. 490 (1975); *see also* Fed. R. Civ. P. Supp. R. G(8)(b). Claimants lack standing because the Defendant Property is contraband and illegal to possess. The Supreme Court has said that for "prudential" reasons federal courts must limit the exercise of their jurisdiction to cases where the claim of the person asserting standing falls "within the zone of interests protected by the law invoked." *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 12 (2004) (prudential standing embodies "judicially self-imposed limits on the exercise of federal jurisdiction"); *see also, e.g., Rodgers v. United States,* 362 F.2d 358 (8th Cir. 1966) (no standing in contraband gun). An interest in "contraband or other

property that is illegal to possess" is not a protected interest, and therefore neither Gibson nor Nagel have prudential standing and the government shall not be required to return such property. 18 U.S.C. § 983(d)(4); 18 U.S.C. § 983(a)(1)(F).

Claims to the Defendant Property are not within the zone of interests Congress seeks to protect. *Id.; see also U.S. v. Real Property Located at 730 Glen-Mady Way,* 590 F. Supp. 2d 1295 (E.D. Cal. 2008) (persons excluded from zone of interest by statute do not have standing to contest forfeiture).

Once it is established by the government by a preponderance of the evidence that the Defendant Property is contraband or property that is illegal to possess, Claimants' claims must be dismissed. *See* 18 U.S.C. § 983(c); s*ee also United States v. 37.29 Pounds of Semi-Precious Stones,* 7 F.3d 480, 485 (6th Cir. 1993) (illegal drugs are contraband per se)(over-ruled on other grounds).

This Court must determine whether Gibson and Nagel have standing to enter this lawsuit, and in order to make that determination, the Court must first determine if the Defendant Property is contraband. The United States has requested a hearing to allow this Court to make a determination by a preponderance of the evidence as to whether the Defendant Property is, as a matter of law and fact, contraband or illegal to possess.

**B.** **The Lacey Act Is A Strict Liability Statute For Contraband Or Property Illegal To Possess.**

The Defendant Property is contraband or property illegal to possess because it was harvested or exported in violation of Malagasy law that protects Madagascar ebony wood and regulates the taking of plants from Madagascar without, or contrary to, required authorization - all in violation of the Lacey Act. *See United States v. 2,507 Live Canary Winged parakeets (Brotogeris Versicolorus),*

Page 14 of 25

689 F. Supp. 1106, 1117 (S.D. Fla. 1988) (property possessed in violation of the Amendments to the Lacey Act found at 16 U.S.C. § 3374 are contraband).

The Amendments to the Lacey Act provide for the forfeiture of fish, wildlife and plants on a *"strict liability basis* because the merchandise is, in effect, contraband." *Id.* (*emphasis* original)

> The fact that merchandise such as endangered species can be imported under special circumstances for which a federal permit has been [granted] does not disqualify it as contraband. Even narcotics, such as heroin, can be imported with the proper permits. Once the government has made a prima facie showing that the shipment is unlawful, a decree of forfeiture must be entered by the court. As noted by the Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 [94 S.Ct. 2080, 40 L.Ed.2d 452] (1974), "good faith or innocence on the part of the owner of property subject to seizure is immaterial." S.Rep. No. 97-123, 97th Cong. 1st Sess. 13, *reprinted in* 1981 U.S. Code Cong. & Admin.News 1748, 1760 (footnote omitted) (emphasis added). *But see United States v. 3,210 Crusted Sides of Caiman Crocodilus*, 636 F.Supp. 1281, 1286-87 (S.D.Fla.1986). The legislative history could not be clearer. Moreover, the statute clearly expresses the legislative intent. It states that wildlife imported unlawfully shall be subject to forfeiture "notwithstanding any culpability requirements for civil penalty assessment or criminal prosecution ..." 16 U.S.C. sec. 3374(a)(1). This unambiguously renders the initial forfeiture of wildlife unlawfully imported under this title a matter of strict liability, subject only to the mitigation and remission provision of section 3374(b). *See* S. Rep. No. 97-123, 97th Cong. 1st Sess. 13, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1760.

*Id.* at 1117 - 18 (footnote omitted).  It is unlawful to harvest or export the Defendant Property under Malagasy law and therefore, the strict liability provision of the Lacey Act requires a decree of forfeiture, a recognition that the Defendant Property is contraband and the striking of the Claimant's ownership claim for lack of standing.

C.     **The Defendant Property Is Contraband and/or Illegal To Possess.**

       **1. *Products whose final use is not clear and which must be substantially transformed after import into the United States are assigned a different tariff than finished products.***

Page 15 of  25

Tariffs in the United States are similarly based on the finished or unfinished status of the item being shipped.  In a 1993 Ruling issued by the USCS regarding the tariff classification of sawn rosewood and ebony from India, ebony which was imported cut to size as 600mm x 60/70 mm x 9 mm for fingerboards was determined to be classified in HTC duty-free 4407 Series.  The ruling had been requested on sawn pieces of wood to be used in manufacturing guitar and violin parts. Cust.B.&Dec. NY 881630("Ruling NY 881630"). (Exhibit 7: Ruling NY 881630)

 In the 1990 Ruling issued by the USCS to Gibson Guitar regarding the appropriate HTC to a guitar to be assembled in the United States, USCS discussed the meaning of "substantially transformed" in relation to guitar parts. Cust.B.&Dec. HQ 733299. (Exhibit 6: Ruling HQ 73329). If the 'parts' had to be substantially transformed after entry into the United States,  they would be properly declared duty-free HTC Chapter 4407.  *Id.*  If the items did not need to be substantially transformed after entry into the United States, and the component as imported constitutes the essence of the instrument, then no significant change for tariff purposes occurs and the parts would be properly declared under HTC Chapter 9209 for parts and accessories for fretted stringed instruments with a duty rate of 5.7%. *Id.*

> In order to bring any material for manufacturing within a tariff designation which covers one of its ultimate uses it should be so far advanced by the processes applied thereto in the line of that particular ultimate use that, either from an examination *per se* evidences of its ultimate use are made clear or so far advanced that its utility in any of its other possible uses shall have been destroyed.  *Athenia Steel & Wire Co. v. United States* (1 Ct. Cust. Appls., 494, 495: T.D. 31528).

 *United States v. Lyon & Healy,* 4 U.S.Cust.App. 438, 441 (1913).

In the 1990 Ruling, USCS determined that 9200 was the correct HTC Chapter for the parts described by Gibson at that time because "the body and neck are precut in order to fit together;  it

is evident that little or no cutting is required to make them fit together cleanly. The neck is fitted with frets, and holes have been cut to receive the tuning gears." Cust.B.&Dec. HQ 733299 . (Exhibit 6: Ruling HQ 73329).  Further, the character and use of the article remained essentially the same both before and after importation.  *Id.* at 2.  A substantial transformation involves a kind of physical change in the imported item, including cutting, shaping, bending and the like.  *Id.* at 3.  In *Carlson Furniture Industries Inc. v. United States*, 65 Cust. Ct. 474, 482 (1970) (attached as Exhibit 9), a finding of substantial transformation was made regarding wooden parts which go into the making of chairs; it was clear that the wooden parts would not be sold and passed on in the condition in which they were imported, but would required additional work, including cutting, gluing, fitting, upholstering, and other manufacturing operations undertaken by the importer.

In *The Glolite Corporation v. United States,* 24 Cust.Ct. 250, *3 (Cust.Ct, 1950)(attached as Exhibit 10), parts of toys were deemed to be finished because the actual toys were "in 'knocked-down' form, just as clearly as though they had first been fitted together to form such toys and then dismantled for convenience of shipment." *Id.*  In contrast, in this case, the Defendant Property was unfinished, properly declared under HTC Series 4407 as sawn wood, and as further explained below, would be and in part was substantially transformed after importation, through physical change into a finished product.

### 2. The Defendant Property is an unfinished product.

The alleged authorizations provided by Gibson did not provide for the legal harvest or export of the ebony received by Gibson not only because the ebony did not meet the inventory standards of Order 16.030/2006, but also because the ebony received by Gibson was not a finished product. The product was ebony "blanks" – a fact acknowledged by Gibson CEO Henry  Juszkiewicz.

Case 3:10-cv-00747   Document 31   Filed 06/04/11   Page 17 of 25 PageID #: 333

(Exhibit 1: Seiler Affidavit) Blanks are an unfinished product. Blanks are blocks of wood processed to specific dimensions, that can then be cut by the guitar manufacturer into fingerboards and other instrument parts." (Exhibit 1-13 Seiler Affidavit, Program for an information-gathering trip to Madagascar, 2, 3). Gibson would have the blanks called a guitar fingerboard. Gibson well knows that blanks are not finished products. The Ruling Gibson received in 1990 from USCS makes clear that wood that must be cut and reshaped for use, as the blanks intended for transformation into fingerboards must, undergoes a "substantial transformation. Cust.B&Dec. HQ 733299. (Exhibit 6: Ruling HQ 73329). Malagasy law requires that an object be "no longer capable of being modified" in order to be a finished product prior to exportation; clearly when an item undergoes a "substantial transformation" after exportation, it certainly was capable of being modified prior to exportation. Order 16.030/2006. (Exhibit 1-3 : Seiler Affidavit, Order 16.030/2006, 7,9). The 2005 USCS Ruling NY L83277 received by Hunter Trading Corporation, that ebony wood (Diospyros spp.) in sawn sizes of 521 x 70 x 9mm sourced in the sawn sizes stated in Madagascar will be assigned Tariff Code 4407.99.0091 as rough sawn wood, cements the fact that the Madagascar ebony wood as imported was not a final product. The Defendant Property was simply rough sawn wood which had to be cut, shaped, bent and the like to be substantially transformed into a finished product known as a fingerboard.(Exhibit 1: Seiler Affidavit).

The Defendant Property was obtained from Thunam, whose "factory" was nothing more than a few people with a table saw. (Exhibit 1: Seiler Affidavit). The only property Thunam apparently had at his disposal was rough sawn wood which was seized in place by the Malagasy government.

When Nagel imported the Madagascar ebony wood into the United States, it was declared under the Harmonized Tariff Schedule of the United States under the rough sawn wood tariff code

number 4407.99.0193 ("4407 Series") which is imported duty free. (Exhibit 8: Ruling NY L83277)(this designation includes ebony wood (Diospyros spp.) in sawn sizes of 521 x 70 x 9 mm originating from Madagascar, shipped to Germany and then forwarded to the United States). Similarly, the Nagel to Gibson invoices describe the Madagascar ebony in sawn sizes of 508 x 70 x 9mm, and 521 x 70 x 9mm. (Exhibit 3: Interrogatory Supp.Resp, 8, 00001-00008) . Clearly the 4407 Series applies to wood intended for **manufacture into** a fingerboard. (Exhibit 7: Ruling NY 881630). If the Madagscar ebony had been a finished product, Hunter Trading Corporation would have declared it in the HTC 9200 Series, as part of a musical instrument. (Exhibit 1-11: Tariff Code Excerpt ).

Further Gibson knew that blanks were not finished products because the corporation had been working with Music Wood Coalition in an attempt to eventually change the law, not only to promote an independent sustainable source of legal, certified Madagascar Ebony, but to change the definition of a finished product to allow export of blanks. (Exhibit 1-: Seiler Affidavit, Program for Information gathering trip to Madagascar, 2, 3).

### 3. Madagascar banned all harvesting of ebony and banned (with a limited exception) all export of ebony.

In addition to the fact the Defendant Property is unfinished wood, precious wood such as Madagascar ebony is contraband or illegal to possess under the Lacey Act, 16 U.S.C. § 3374, *et seq*. Specifically, 16 U.S.C. § 3374 authorizes forfeiture of all plants imported, exported, transported, sold, received, acquired, or purchased contrary to the provisions of any law or regulation of any foreign law in violation of 16 U.S.C. § 3372(a)(2)(B).

Madagascar ebony is also contraband or illegal to possess pursuant to 18 U.S.C. § 545, which authorizes forfeiture of merchandise imported or brought into the United States, contrary to law or merchandise received, concealed, bought, sold, or transported or sold after importation, knowing the same to have been imported or brought into the United States contrary to law.

The Defendant Property was seized from the Gibson manufacturing facility by Federal law enforcement agents because it was in the United States in violation of Madagascar law which has banned harvesting and commercial activities related to ebony since 2000 with extremely limited exceptions.(D.E. 1: Complaint; D.E. 3: Affidavit; D.E. 12-1: Search Warrant Affidavit). *See Malagasy April 30, 2000 Order* 11832/2000; *see also 2006 Malagasy Inter-Ministerial Order 16.030/2006* . (Exhibit 1-3: Seiler Affidavit, 2-5: Order 11832/2000, Order 16.030/2006, 6-9 ; Exhibit 2: August 2009 Global Witness report, v). These limited exceptions apply to certified ebony stock which has a valid permit and is a finished product. *Id.* Order 16.030/2006. With respect to the harvesting of ebony, Order 16.030/2006 provides that:

> "[t]here is a *ban on the harvesting of ebony. . . and* [a]ny *undeclared stockpiles* shall become the subject of legal action on the basis of violations of existing forestry law. Products *shall be seized and confiscated* by the Government. . . It is *mandatory for any stockpile* constituted on the basis of a currently valid permit *to be declared* to the relevant Inter-Regional Environment, Water and Forest Department. (*emphasis added).*

With respect to commercial activities involving ebony, Order 16.030/2006 provides that:

> *Any transportation and commercial activities* related to [ebony] *must be accompanied by regulatory paperwork* issued by the proper officials of the Ministry entrusted with Forest Administration. *Export* of [ebony] shall *only be permitted in the form of finished products. Finished wood* signifies any wood that has been

Page 20 of 25

shaped and processed to its final use and *is no longer capable of being modified*, specifically: . . . [a] *guitar fret board*.[15] (*emphasis added*).

Order 16.030/2006 abrogated any prior contravening provisions, took effect immediately and tasked the Director-General of Water and Forests, the Customs Director General and the Director for the Promotion of Foreign Trade "with the implementation of this order, which shall be published in the Official Bulletin of the Republic of Madagascar and disseminated where necessary."

Order 16.030/2006 banned all harvesting of ebony. Id. Order 16.030/2006 allowed the export of some ebony if (1) it came from **pre-existing** stocks which had been (2) acquired while in possession of a valid permit, (3) declared to the relevant Interregional Management of the Environment, Water, and Forests, (4) accompanied by regulatory documents issued by the relevant authorities of the Ministry in charge of forestry administration, and finally (5) was a finished product. Order 16.030/2006 further provided that all unidentified stocks would be seized. A July 3, 2007 Madagascar Inter-ministerial Order 10885/2007 (hereinafter "Order 10885/2007") affirmed the prior ban and banned all exportation of wood extracted from all categories of natural forest, whether it be raw or semi-finished; and allowed only finished products authorized for export. (Exhibit 1- 3: Seiler Affidavit, Order 10885/2007, 10 -13)

All the legal ebony stock inventories which had been approved by the Madagascar government had been exported prior to April 2009 and therefore pursuant to Malagasy law, Thunam had no means to acquire legal stock. See Inter-Ministerial Order No. 003/2009 (hereinafter Order

---

[15] The American Heritage Dictionary defines a fretboard as a fingerboard with frets. http://m.wordnik.com/words/fretboard (Last viewed 5/31/11) and defines a fingerboard as a strip of wood on the neck of stringed musical instrument against which the strings are pressed in playing. Http://m.wordnik.com/wods/fingerboard (Last viewed 5/31/11).

003/2009). (Exhibit 1-3: Seiler Affidavit, Order No. 003/2009); (Exhibit 2: August 2009 Global Witness report,v) A September 17, 2009 Communique strongly reminded - no timber concessions were granted, all cutting and extraction was illegal, and violators would be punished. (Exhibit 1-3: Seiler Affidavit, Communique, 20-21) This debunked the rumor that permission was being granted for timber of dubious origin to be purchased.

### 4. Thunam's alleged authorizations to export finished ebony did not make the export of the ebony legal.

As noted earlier, Nagel has provided alleged authorizations dated March 27, 2009 for Roger Thunam to export finished ebony. However, the authorizations for exportation of finished ebony are subject to Order 16.030/2006 which required an exported product to be finished. Further, in March 2009, by law Thunam had no legal stock of ebony. *See* Inter-Ministerial Order No. 003/2009 (hereinafter Order 003/2009). (Exhibit 1-3: Seiler Affidavit, Order No. 003/2009, 14- 19). Because the ebony he exported was not from **pre-existing** stocks which had been acquired while in possession of a valid permit and declared to the relevant Interregional Management of the Environment, Water, and Forests, the ebony is in violation of the Lacey Act, and is contraband. *See United States v. 2,507 Live Canary Winged parakeets,* 689 F. Supp. at 1117 - 18 (property possessed in violation of the Amendments to the Lacey Act found at 16 U.S.C. § 3374 are contraband). Additionally, as the wood exported by Thunam consisted of ebony blanks and not finished ebony, the authorizations do not apply to the Defendant Property.

### 5. If Gibson or Nagel are victims of fraud, their avenue of relief is not as claimants.

Because the Madagascar ebony wood is contraband or illegal to possess, then Gibson may not assert an ownership interest in it. 18 U.S.C. § 983(d)(4). As a consequence, if Gibson is a victim

of a wrongdoer's act (in this case by receiving banned Madagascar ebony wood which has been harvested and exported in violation of Malagasy law), then Gibson lacks standing to contest the forfeiture of the Defendant Property. Thus as the recipient of contraband, Gibson must rely on filing a civil law suit against the wrongdoer, or in a case in which funds are available, recipients may apply to the United States for remission of forfeited funds or of the proceeds of the crime once the forfeiture action, or any criminal action, is complete. *See* 16 U.S.C. § 3374(b), 18 U.S.C. § 3664 and 28 C.F.R. § 9. For example, in *United States v. One-Sixth Share,* 326 F.3d 36 (1st Cir. 2003), the First Circuit held that the family of a murder victim lacked standing to contest forfeiture of the alleged murderer's property. The court said, "Congress has provided for justice a different way: it has provided that the Government, which stands for all the citizens, may take the criminal's property by forfeiture . . . It has limited those who may assert competing claims," and it has authorized the victims to petition the Attorney General for remission. *Id.* at 45; *see* U.S.C. § 981(e)(6).

## IV.    CONCLUSION

Thunam's Madagascar ebony wood had been seized in place by the Malagasy government and was therefore contraband. When Thunam's Madagascar ebony wood was exported to the United States, it allegedly had authorization papers which seemed to allow the exportation of finished Madagascar ebony wood by Thunam. However, the actual wood shipped was shipped duty-free as rough sawn wood. Further, there was a Madagascar Order in place which named Thierry Body (not Thunam) as the only person allowed to ship ebony in the raw state from Madagascar. When Gibson received it in October 2009, it received rough sawn [unfinished] Madagascar ebony wood that had been originally seized in place in Madagascar, was shipped under the rough sawn wood Tariff Code.

When the Madagascar ebony wood was found at the Gibson manufacturing facility, some of

it was still in the raw form, and some was in the process of being substantially transformed into the intended final product - a fret board.

The shipped unfinished ebony with the false authorizations is contraband pursuant to Malagasy law, the Lacey Act, and 18 U.S.C. § 545, and therefore neither Nagel or Gibson have prudential standing to contest the forfeiture of contraband.

Additionally, Nagel's claim must be dismissed as his claim is only as to items seized from a location other than Gibson's manufacturing facility and as such are not within the realm of this lawsuit.

Based on the foregoing law and facts, the United States respectfully requests that the Court strike Gibson's and Nagel's claims.

Respectfully submitted,
JERRY E. MARTIN
United States Attorney for the
Middle District of Tennessee

By:     /s Debra Teufel Phillips

Debra Teufel Phillips (BPR 011706)
Assistant United States Attorney
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
Telephone: (615) 736-5151

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following, if registered, by operation of the Court's electronic filing system. If not registered, notice was mailed by regular U.S. Mail to:

| | |
|---|---|
| Steven Allen Riley<br>Timothy G. Harvey<br>W. Russell Tabor, III<br>Riley, Warnock & Jacobson<br>1906 West End Avenue<br>Nashville, TN 37203 | David Alexander Fardon<br>Harwell, Howard, Hyne, Gabbert & Manner, P.C.<br>315 Deaderick Street<br>Suite 1800<br>Nashville, TN 37238 |

s/ Debra Teufel Phillips
Debra Teufel Phillips