UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:10-cv-00747 |
| ) | |
| EBONY WOOD IN VARIOUS FORMS, ) | Judge William J. Haynes |
| ) | |
| Defendant. ) | |

**CLAIMANT GIBSON GUITAR CORP.'S MEMORANDUM
IN SUPPORT OF MOTION TO RECONSIDER AND TO REOPEN CASE**

Nearly two years ago, armed federal agents stormed Gibson Guitar Corp.'s ("Gibson") facilities without warning and seized its property. Since then, Gibson has diligently sought both the return of its property and some measure of accountability from the Government for its actions – actions that Gibson believes were without a valid legal predicate. Gibson has cooperated with the Government in its investigation and has given the Government all of the information it has requested. Gibson seeks only justice in return.

To date, however, justice for Gibson has proven as elusive as the response of the Government, which has changed its theory each time that Gibson demonstrates the then-current theory is without a legal basis. The parties have engaged in this process and litigated this matter for more than one year. The Government has conducted discovery, filed motions, and fleshed out Gibson's position in a manner that is not available in a criminal investigation. In response, Gibson undertook expensive and extraordinary efforts to obtain certified public records and affidavits from the authoritative Madagascar Government officials proving that they actually inspected the wood at issue and specifically approved the export of the wood in accordance with

1

Madagascar law. (See Doc. 40 and 40-1 to 40-21.) The Government has just two reactions to this conclusive evidence: (1) posit an entirely new theory disavowing all official decisions of the Madagascar Government so that it can keep Gibson's wood anyway, and (2) attempt to call a hasty time-out to avoid imminent defeat.

Gibson respectfully submits that the Government's newest theory also fails--indeed it fails as a matter of law--because it conflicts with the official position taken by the U.S. State Department which, unlike the Department of Justice, has actual authority to set trade policies. And no reason exists to further delay justice, as Gibson withdrew the discovery that served as the ostensible basis for the Government's motion to stay, thus rendering that motion moot. Any request for a stay is simply unreasonable given that the Government has litigated this matter for more than one year and has been conducting a criminal investigation for at least two years. Gibson respectfully requests that the Court decide the merits of its Motion to Dismiss. (Doc. 7.)

Specifically, Gibson specifically seeks reconsideration of the Court's order entered September 28, 2011 (Doc. 67) (the "Order"), denying all pending motions and administratively closing this case. Gibson asks the Court to reopen the case, deny the U.S. Government's renewed motion to stay (Doc. 66), determine that no additional discovery is necessary or appropriate, and grant Gibson's Motion to Dismiss (Doc. 7).

**1.      The Government's Motions to Stay are Moot.**

The Government moved to stay this case to avoid Gibson's request for written discovery. Gibson has since voluntarily withdrawn its discovery and is not now seeking any discovery. (Doc. 44, 45, 50.) As Gibson has withdrawn the discovery that provided the only basis for the requested stay, the Government's motions to stay are moot.

Even if the Government's motion were not moot, courts generally refuse to stay civil forfeiture actions to prevent discovery unless the Government demonstrates that the claimant's request for civil discovery will have a specific adverse effect on the government's related criminal investigation. United States v. All Funds ($357,311.68), 2004 WL 1834589, at *2 (N.D. Tex. Aug. 10, 2004) ("There is no presumption that civil discovery, in itself, automatically creates an adverse effect on the government's related criminal proceeding."); United States v. Currency $716,502.44, 2008 WL 5158291, at *4 (E.D. Mich. Dec. 5, 2008) ("Neither the fact that the Government would be subject to civil discovery, nor bare assertions of hardship by the Government, are enough to satisfy the statutory standard.").[1]

The Government's only basis for a stay was Gibson's discovery request, which has been withdrawn. The Government has not posited any other valid basis for a stay. Gibson is entitled to have its motion to dismiss, which is based only on a legal issue, granted so that Gibson can recover property that the Government has basis for holding. For this reason, Gibson submits that the case should not be stayed and the Government's renewed motion to stay (Doc. 66) should be denied.

**2.  Gibson's Motion to Dismiss is Ripe for Determination on the Merits, And No Additional Discovery is Necessary.**

In an effort to avoid Gibson's Motion to Dismiss, the Government has claimed that it needs additional discovery on the issue of standing. Its position is misplaced as a matter of law. The Government's own pleadings conclusively establish that Gibson has standing by admitting

---

[1] The "loss of the government's usual tactical advantage is insufficient to justify enjoining the civil proceeding." S.E.C. v. Fraser, 2009 WL 1531854, at *3 (D. Ariz. June 1, 2009). There is generally no cognizable harm to the government when a party in a civil matter against the government obtains evidence that may assist him in a criminal case. Id. Stays are disfavored when a protective order or other means may avoid any cognizable harm. Id.; see also 18 U.S.C. § 981(g)(3).

that the property at issue was taken out of Gibson's possession. Nonetheless, Gibson has provided all discovery related to standing that is discoverable under the Sixth Circuit case law.

The Supreme Court has explained that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or the issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). A claimant need not prove the merits of his underlying claim and only needs to show a "facially colorable interest" in the property. United States v. $515,060.42, 152 F.3d 491, 497-498 (6th Cir. 1998). Such interest may be an ownership interest or a mere possessory interest because "an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." Id., 152 F.3d at 497. "[A] rule requiring claimants to support all claims with standing evidence would often involve unnecessary time and expense for the litigants as well as the court." Id.

The Sixth Circuit has held that when the issue of standing is raised, the Government is not entitled to comprehensive discovery describing every facet about a claimant's relationship to the property at issue.[2] United States v. $515,060.42, 152 F.3d at 499. Such a claimant need not

---

[2] The Sixth Circuit noted and summarized the following cases supporting this principle: United States v. $191,910.00, 16 F.3d 1051, 1058 (9th Cir. 1994) (rejecting Government's argument that claimant lacked standing because he did not explain his possessory interest in detail in his claim); United States v. $38,570, 950 F.2d 1108, 1113 (5th Cir. 1992) ("Flores need not have submitted his claims with additional evidence, because the government had admitted Flores' relationship to the currency in its complaint...[T]he government admitted...facts indicating Flores' involvement with the currency."); United States v. 3340 Stallcup, 794 F. Supp. 626, 633 (N.D.Tex.1992) (where allegations in Government's complaint admitted claimant had some involvement with the seized *res*, such admission sufficient to establish claimant's standing); United States v. 570 Lathers, 2 F.3d 1151, 1993 WL 307084, at *4 (6th Cir. Aug. 12, 1993) (rejecting Government's argument that claimant introduced insufficient evidence of ownership or possession where the Government conceded that the claimant was only conceivable owner of the seized property and claimant admitted ownership in answer to forfeiture complaint); United States v. Blair, 843 F.2d 1388 (4th Cir. 1988) (finding that claimant demonstrated facially colorable ownership interest in seized property where property seized from wife's home and government did not dispute that house was claimant's residence as well); see also, e.g., United States v. Various Computers and Computer Equip., 82 F.3d 582, 585 (3rd Cir. 1996) (finding

4

provide discovery regarding his interest in the property if the Government has "admitted the facts indicating the claimants' relationship to the [property] in its complaint and in its briefing to the district court." Id. at 499; see United States v. $85,668.00 In U.S. Currency, 2009 WL 1507150, at *2 (D. Utah May 27, 2009) ("The government cannot prevent every person unwilling to completely explain his relationship to the property that he claims to own and that is found in his possession and control from merely contesting a forfeiture of that property in court. It may well be that forfeiture ultimately will prove appropriate, but we find it obvious that such a claimant risks injury within the meaning of Article III and thus may have his day in court.").

In this case, Gibson has submitted (1) a verified claim stating that it is the owner of the property (Doc. 4), (2) a declaration attesting that it owns the property at issue (Doc. 14.4), (3) sworn interrogatory responses describing its ownership (Doc. 31.3 and 57.2); and (4) documents, including invoices, purchase orders, and proofs of payment.[3] Furthermore, the Government's pleadings admit that Gibson has at least a possessory interest in the property, which, as noted, is sufficient to establish standing. Specifically, the affidavit attached to the complaint admits that

---

claimant had statutory standing where the claimant's claim did not include statutorily required verification but the district court and the Government were aware of the source of claimant's property interest), *cert. denied,* 519 U.S. 973, 117 S.Ct. 406, 136 L.Ed.2d 320 (1996); United States v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir. 1991) (holding that where the claimant's court documents adequately apprised government of claim and basis upon which claim rested, the documents, when read together as a whole, evidenced a sufficient interest in the seized property so that the district court properly treated them as satisfying the statutory standing requirements).

[3] More specifically, Gibson has produced purchase orders, invoices, and evidence of wire transfers all related to the shipments described in the complaint. Gibson produced these materials eight months ago, in January 2011, and they were later filed with the Court as Doc. 31.3, pages 20-53. At the Government's request, Gibson produced the import and export documentation for these shipments in April 2011, and these materials were later filed as Doc. 57.2, pages 20-38. Finally, Gibson went beyond its obligations and acquired additional certified documents and declarations from the Madagascar government about these exports and filed these materials plus translations in July 2011, as Doc. 40-1 through 40-21. The Government cannot seriously contend that its lacks sufficient information to determine whether Gibson has standing.

5

the property was taken from Gibson's Massman Drive facility during the execution of a search warrant. (Doc. 3, ¶¶ 21-22.) The Government provided Gibson a property receipt for the items it seized. (Doc. 3-2.) The Government filed a second affidavit admitting that the property at issue was taken from Gibson: "The property receipt [see Doc. 3-2] . . . represents a brief summary of the property seized from the Gibson manufacturing facility and includes ebony wood in various forms as it was undergoing the Gibson Guitar manufacturing process to be transformed into 'fretboards' for use on Gibson products. . . ." (Doc. 31-1, ¶ 4.) Any argument that Gibson has no standing to appear in this case and to require the Government to prove its case is without merit.

Further, the Government concedes that the property is not contraband *per se* as it openly recognizes that properly-approved ebony wood may be legally exported from Madagascar. The Government's affidavits state that the pertinent law is Madagascar Interministerial Order No. 16.030/2006, which allows the export of ebony in finished form. (Doc. 3, Seiler Aff., ¶ 10; Doc. 12.1, Seiler Aff., ¶ 11.) The Government's memorandum in support of its motion to strike also relies upon this Madagascar Order. (Doc. 31, pages 19-21.) The Government filed a translation of this Madagascar Order, and Article 5 of the Madagascar Order states that finished ebony may be exported. (Doc. 33.2, pages 9-10.)

Given that ebony may be legally exported and legally possessed, it is not contraband *per se* and the U.S. Government cannot avoid a judicial determination on the basis of prudential standing. Gibson has an ownership and possessory interest in ebony wood that can be legally exported from Madagascar, and thus standing exists as a matter of law. But the Government is

6

not entitled to discovery on the ultimate issue in the case until after Gibson's motion to dismiss is decided. See Supplemental Rule G(6).[4]

Gibson also notes that the Government made a calculated decision to file its motion to strike after it was satisfied with Gibson's discovery responses on the issue of standing. The parties filed several notices with the Court stating that the Government wanted to conduct discovery before filing its motion to strike and that Gibson would supply the pertinent discovery before the Government filed its motion. (Doc. 25, 26, 28, 29.) Gibson provided the information, and satisfied with the discovery it received, the Government filed its motion to strike on June 4, 2011. (Docket Entry 30.) The Government did not request additional information until Friday, August 26, 2011, which was one business day before the Court's scheduling conference in this matter and after the parties had already fully briefed both the Government's motion to strike and Gibson's motion. The request for new information—information which, as noted, is irrelevant and impermissible at this stage—was a delay tactic undertaken in light of the realization that the case should be dismissed as a matter of law.

---

[4] The Government repeatedly claims that to have standing, Gibson must prove the property at issue is not contraband, but this is wrong. See 18 U.S.C. § 983(c)(1) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."). "It must be remembered . . . that in a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated." United States v. $557,933.89, 287 F.3d 66, 79 (2nd Cir. 2002) (emphasis in original). "If the government fails to meet its burden of proof. . . the claimant need not produce any evidence at all—i.e., the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof." Id. "The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only when someone with a legitimate interest contests the forfeiture." Id.

7

**3.   The U.S. Department of State has Approved Trade with Madagascar and Endorses the Madagascar Agency that Approved the Shipment at Issue.**

The Government's newest theory is that it may disregard the official acts of the Government of Madagascar. That argument finds no support in law or in fact and, moreover, conflicts with the official policy of the U.S. State Department.

First, Gibson filed certified copies of official Madagascar Government records proving that the Madagascar Government inspected the wood at issue, determined that it was "finished" within the meaning of Madagascar law, and approved its export. (See Doc. 40 and 40-1 to 40-21.) Because the wood was legally exported pursuant to Madagascar law, there can be no violation of the U.S. Lacey Act as a matter of law. The U.S. Government cannot second-guess the decision of a sovereign foreign government concerning the legality of exporting its own natural resources.[5]

Confronted with this proof, the U.S. Government now takes the position that the United States does not recognize the actions of the current Madagascar Government.[6] (See Doc. 57.) This is inaccurate. In fact, the United States does recognize the Madagascar Government. The U.S. Department of State's official documents both encourage American companies to trade with

---

[5] See World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1164-1165 (D.C. Cir. 2001) (refusing to second-guess the export decision of a foreign sovereign with regard to its own natural resources and noting that U.S. courts may not inquire "into the validity of the public acts a recognized foreign sovereign power committed within its own territory"); Bokkelen v. Gruman Aerospace Corp., 432 F.Supp. 329 (E.D. N.Y. 1977) (same); MOL, Inc. v. Peoples Republic of Bangladesh, 572 F. Supp. 2d 79 (N.D. Ill. 2003) (refusing to second guess foreign sovereign's regulation of its own wildlife). As the World Wide Minerals court noted, "the right to regulate imports and exports is a sovereign prerogative." 296 F.3d at 1154. Second-guessing such decisions disrupts international comity and interferes with the conduct of foreign relations. Id.

[6] Obviously this position undermines the Government's entire case, which is premised upon a violation of Madagascar law. Put another way, if the Madagascar Government is unrecognized by the United States, then how can there be a violation of Madagascar law that is a predicate for charging a violation of the Lacey Act?

Madagascar and refer them to the very same Madagascar Agency that approved the shipments at issue in this case. Ironically, the Government now seeks to punish Gibson's reliance on the very same officials that the U.S. State Department has endorsed. The Court should reject the Government's new argument to avoid intruding upon the Executive Branch's prerogative to regulate international relations and trade between sovereign nations.

The Government's authorities do not support its new argument. The U.S. Government relies upon Williams v. Bruff, 96 U.S. 176 (1877), a Civil War reconstruction era case in which the Supreme Court refused to acknowledge a specific act of the Confederacy during the Civil War, noting that the Confederacy was always illegitimate. Id. at 185. Unlike the Confederacy, Madagascar is a recognized sovereign nation. The United States has an embassy in Madagascar. See http://www.antananarivo.usembassy.gov/. Likewise, Madagascar had an embassy and consulates in the United States. See http://www.madagascar-consulate.org/embassies-usa.html.

The State Department's official publication comes nowhere close to rejecting the official acts of the Madagascar Government, and there is certainly no ban against trade with Madagascar. In 2010, the U.S. Department of State and the U.S. & Foreign Commercial Service published a document called "Doing Business in Madagascar: 2011 Commercial Guide for U.S. Companies" (Excerpts are attached as Exhibit A.[7]) Although it acknowledges unrest in the country, the document encourages trade between the nations and advises American corporations accordingly. Chapter 5 expressly discusses trade regulation in Madagascar and states that American companies may export from Madagascar consistent with Madagascar laws:

> There are no U.S. export controls specifically related to Madagascar which companies must respect when exporting. However, companies should ensure that

---

[7] The complete document is available at:
http://www.antananarivo.usembassy.gov/uploads/ZI/VP/ZIVPQJmobFfciu9aI_lf2g/CCG-2011-Madagascar.pdf

9

Case 3:10-cv-00747  Document 70  Filed 10/07/11  Page 9 of 15 PageID #: 1110

> imports of flora or fauna from Madagascar to the U.S. adhere to the provisions of the Lacey Act, which does not allow the import, export, transport, sale, receipt or purchase of plant materials taken, possessed, transported, or sold in violation of U.S. or foreign laws.

(<u>See</u> Exhibit A, Excerpts, page 3.) Chapter 5 even lists the export documentation that the Madagascar authorities require for export. (<u>See</u> Exhibit A, Excerpts, page 3.) In other words, in its 2011 publication, the U.S. Department of State has taken the position that American companies may export from Madagascar if the Madagascar authorities issue and approve the export documentation that Madagascar law requires. In this case, such approval and related documents were issued by Madagascar Government officials.

Importantly, the U.S. Department of State's document repeatedly advises American companies to contact Madagascar government officials for further information and goes so far as to provide names and contact information of current Madagascar government officials, such as the Prime Minister and the Presidency. (<u>See</u> Exhibit A, Excerpts, pages 4-8.) Indeed, Chapter 9 of the document lists the contacts for Madagascar government agencies, and it specifically includes the Ministry of Environment and Forestry, also known as "MEFT." (<u>See</u> Exhibit A, Excerpts, page 6.) MEFT is the very same agency that approved Thunam's shipment in this case. (Doc. 40-1, ¶¶ 3-9.)

Importantly, even if Madagascar were a rogue nation with an unrecognized existence, Gibson may still rely on its official acts. Courts give effect to the decrees of an unrecognized government when those decrees impact the rights of American citizens as opposed to the rights of the rogue government itself. <u>Banque de France v. Equitable Trust of New York</u>, 33 F.2d 202, 206 (1929) ("Justice requires that effect should be given by our courts, even though we do not recognize the Russian Government, to those acts in Russia upon which the rights of our citizens

10

depend, providing that in so doing our judicial department does not encroach upon or interfere with the political branch of our government.").[8]

Ultimately, the Government's argument that Gibson cannot rely upon the actions of the very same Madagascar officials that the Department of State recommends is without merit. To the contrary, if this Court rejects the actions of the Ministry of Environment and Forestry, such a ruling will undermine relations between the two nations and will contradict the U.S. Department of State's trade publications.

4.      **The Fact that Madagascar and the U.S. Employ Different Tariff Codes is Irrelevant.**

The Government's reply in support of its motion to strike raised another entirely new argument regarding tariff codes. The Government now complains that the exporter of the wood at issue used a specific tariff code under the harmonized system when the wood was exported from Madagascar and that the U.S. importer used a different tariff code to import the wood into the U.S.[9]

The Government has not identified any Madagascar law violated by use of different tariff codes. Indeed, such a difference in coding has no bearing on whether the products were illegally exported, the necessary predicate for a Lacey Act violation. Moreover, the Lacey Act's statutory language concerning the declaration requirements says nothing about a tariff code. See 16 U.S.C. § 3372(f)(1).

---

[8] As noted by the Banque de France court, despite the Supreme Court's ruling in Williams v. Bruff regarding the Confederacy, courts have even upheld laws of the Confederacy that impacted only private rights, such as marriage or the transfer of property, if such laws were consistent with the U.S. Constitution.

[9] The Government stresses that Gibson's filings do not address these "false tariff codes," but Gibson has never addressed the issue because the Government has never before raised the issue. The complaint says nothing about the tariff codes, and none of Agent Seiler's affidavits, including the affidavit in support of the search warrant, references a tariff code issue at all.

11

At most, the Government's argument only suggests that Madagascar custom officials and the United States disagree on what tariff classification each country expects to be used for exportation from Madagascar on the one hand and importation into the United States on the other. Sovereign nations are free to apply the tariff classifications consistent with their own tariff charges. Case law specifically acknowledges that countries may disagree on tariff classifications and that each country is free to assess its own duties free from interference from any other country. See Terrazzo & Marble Supply Co., Inc., v. United States, 30 Cust. Ct. 202, 209 (U.S. Customs Ct. 1953) ("Whatever meaning or connotation a term may have in a foreign country, it has no bearing on the tariff classification in this country.").[10]

Here, the Madagascar Government officials inspected Thunam's wood and assessed him export duties based on their tariff coding and their law, and Thunam paid the corresponding taxes. (Doc. 40-6, 40-7, 40-16, 40-17.) U.S. customs required that the same products be classified under a different tariff code when imported into the U.S. Apparently, the U.S. Government wants to punish Gibson because the exporter (Thunam) correctly classified the product for export as mandated by Madagascar tariff law and the importer (Hunter Trading) correctly classified the product for import as mandated by the the U.S. Customs tariff law. Such a position is contrary to law.

---

[10] The Terrazzo court went on to cite authority acknowledging that based on their own commerce, countries may disagree on their understanding of how to classify goods: "It may be that in Scotland polished twist is commercially known as twine and that the trade there does not regard as twine any article of jute that is not polished twist; but if there by any such commercial understanding of the terms "twist" and "twine" in Scotland, that fact could not affect the classification of the involved merchandise upon being imported into the United States." Terrazzo & Marble Supply Co., Inc., 30 Cust. Ct. at 209.

12

## **Conclusion**

Gibson requests that the Court reconsider the Order denying all pending motions and administratively closing the case (Doc. 67), reopen the case, deny the renewed motion to stay (Doc. 66), and grant Gibson's Motion to Dismiss (Doc. 7).

Respectfully submitted,

s/ Tim Harvey
Steven A. Riley (BPR # 6258)
Tim Harvey (BPR # 021509)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37202
(615) 320-3700 – telephone
(615) 320- 3737 – facsimile
sriley@rwjplc.com
tharvey@rwjplc.com
rtaber@rwjplc.com

*Attorneys for Gibson Guitar Corp.*

**CERTIFICATE OF SERVICE**

I certify that, on October 7, 2011, a true and correct copy of the foregoing has been served upon the following Filing Users through the Court's Electronic Filing System:

Jerry E. Martin
United States Attorney for the
Middle District of Tennessee
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
jerry.martin2@usdoj.gov

Debra Teufel Phillips
United States Attorney for the
Middle District of Tennessee
110 Ninth Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
deb.phillips@usdoj.gov

*Attorneys for the United States of America*


Alexander Fardon
Harwell, Howard, Hyne, Gabbert, and Manner
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
daf@h3gm.com

*Attorney for Theodor Nagel GMBH & Co KG*

                                                              s/ Tim Harvey